IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

NANCY A WILSON,

       Plaintiff,

v.                                          CASE NO. 1:14-cv-66-MP-GRJ

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying her applications for a period of disability and disability

insurance benefits (DIB).  Doc. 1.  The Commissioner has answered, Doc. 9, and both

parties have filed briefs outlining their respective positions.  Docs. 12, 13.  For the

reasons discussed below, the Commissioner's decision is due to be affirmed.

## I.  PROCEDURAL HISTORY

      Plaintiff filed an application for disability insurance benefits on April 7, 2010,

alleging a disability onset date of November 2, 2009.  (R. 70, 79.)  Plaintiff's application

was denied initially and upon reconsideration.  (R. 82-83, 91-93.)

      At Plaintiff's request, an administrative law judge (ALJ) conducted a hearing on

April 16, 2012, and entered a decision on May 3, 2012, finding that Plaintiff was not

disabled.  (R. 20-30.)  The Appeals Council denied Plaintiff's request for review, making

the ALJ's decision final.  (R. 1-4.)  Plaintiff filed the Complaint in this case on April 17,

2014.  Doc. 1.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from

---

[6] 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

Because Plaintiff's challenge on appeal pertains only to her mental impairments, the summary of the record is limited to evidence relevant to those impairments.

### A.    Medical Evidence

In 1978, when Plaintiff was twelve years old, a psychological report was conducted on Plaintiff at the behest of the Gilchrist County School Board, to determine the appropriateness of her placement in the "Varying Exceptionalities Program."  The Wechsler Intelligence Scale for Children, Wide Range Achievement Test, and Bender Visual-Motor Gestalt Test were administered. At the time of the administration of these tests there was access to previously conducted tests, including the Slosson Intelligence Test for Children and Adults, and the Comprehensive Test of Basic Skills.  During the

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

administration, the examiner noted no unusual observations, and stated that Plaintiff's cooperation, attention, and persistence were all very good.  (R. 247-49.)

On the Wechsler Intelligence Scale, Plaintiff scored a full-scale IQ of 53; verbal IQ of 51, and a performance IQ of 64. The examiner opined that Plaintiff was functioning in the "mentally deficit" range of intelligence, and was achieving below cultural expectations for her age.  Plaintiff had elevated scored in achievement/anxiety, external reliance, inattentive/withdrawn, and inability to change from one task to another.  The examiner stated that her achievement and adaptive behavior were both within the educable mentally retarded range, and it was recommended that she be placed in the educable mentally retarded class.  (R. 249-53.)

Plaintiff underwent a consultative examination by William E. Beaty, Ph.D. on September 8, 2010.  Plaintiff had a problem counting backwards from twenty and repeating the alphabet.  She incorrectly multiplied and added, and mixed up months when reciting them backwards.  However, Dr. Beaty noted that her thought process was intact and organized, she was able to recall four digits forwards and two digits backwards, and two of three words after five minutes.  Dr. Beaty opined that Plaintiff suffered from post-traumatic stress disorder and depression. (R. 463-66.)

## B.    Hearing Testimony

Plaintiff was forty-five years old at the time of her administrative hearing.  Plaintiff testified that she did not complete high school or have a GED, and when she was in school she was enrolled in special ed classes.  She lived with her adult son because she was afraid to live on her own.  Plaintiff testified that she last worked in November of

2009, for a period of about five years, as a bus aid, helping take care of handicapped children.  Before that, she worked in food service for about eight years, and before that, as a store clerk for about four years.  She stopped working because of her vertigo, which impaired her ability to move and caused her to vomit.  (R. 40-42.)

Plaintiff testified that in addition to the vertigo preventing her from working, she also suffered from Fibromyalgia, and her left side was numb from nerve damage from a car accident.  Plaintiff also could not sleep at night because she suffered from restless legs and had to use a CPAP.  (R. 42-44.)

Plaintiff testified that she was able to clean the house, do laundry, and cook. She also has a driver's license and can drive short distances.  Plaintiff said she could read "a little," do basic math such as adding and subtracting, but could not multiply and divide.  (R. 44-46.)

When asked by her representative whether she wanted to tell the ALJ anything else about her condition and limitations, Plaintiff testified that she had migraine headaches.  After concluding the questioning of Plaintiff, Plaintiff's representative asserted at the hearing that Plaintiff was disabled because of her migraine headaches and vertigo.  Although the representative mentioned Plaintiff's limited education and inability to do more than basic math, the representative did not allege that Plaintiff suffered from any intellectual disabilities.  (R. 46-48.)

During questioning by the ALJ, Plaintiff testified that she had applied for about 50 jobs since her alleged onset date, but kept getting turned down.  When given an opportunity by the ALJ to explain why she could not work, Plaintiff said that she could

not sleep at night, someone would have to shake her to wake her up, her whole left side was numb, and when she was married she was abused by her husband and still suffered from nightmares about it.  Plaintiff also suffered from depression and Fibromyalgia, and said that as a result her whole body ached.  (R. 48-56.)

      The Vocational Expert (VE) testified that Plaintiff had past relevant work as a school bus monitor, counter attendant, and home attendant.  The ALJ asked the VE to assume a person of the same age, education, and work background as Plaintiff, with the ability to perform light work with the following restrictions: only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; never climb ropes, ladders, or scaffolds; frequently finger and handle; avoid moderate noise; and avoid hazards such as unprotected heights and exposure to machinery.  The individual was also limited to simple, routine, repetitive tasks with up to three step commands, with occasional changes in the work setting, occasional judgment or decision-making and occasional interaction with the general public and co-workers.  The VE testified that such an individual could not perform Plaintiff's past relevant work, but could perform other jobs which existed in significant numbers in the national economy such as: marker, order caller, and assembler of electrical accessories.  (R. 56-60.)

      Plaintiff's representative asked the VE what percentage of time such a person could be off task in such a job.  The VE testified that employers expected employees to be on task ninety percent of the time.  (R. 60.)

## C.    Findings of the ALJ

      The ALJ determined that Plaintiff met the insured status requirements through

December 31, 2014, and that she had not engaged in substantial gainful activity since the alleged onset date.  The ALJ found that Plaintiff had the severe impairments of: Fibromyalgia, deaf left ear, depression, anxiety, and post-traumatic stress disorder, none of which met or equals the Listings.  The ALJ specifically discussed Listings 12.04 and 12.06 in determining that her conditions did not meet the a listed impairment. The ALJ noted that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in social functions, moderate difficulties in concentration, persistence, and pace, and no episodes of decompensation.

The ALJ found that Plaintiff had the RFC to perform a limited range of light work, with the following restrictions: only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; never climb ropes, ladders, or scaffolds; frequently finger and handle; avoid moderate noise; and avoid hazards such as unprotected heights and exposure to machinery.  The individual was also limited to simple, routine, repetitive tasks with up to three step commands, with occasional changes in the work setting, occasional judgment or decision-making and occasional interaction with the general public and co-workers.  In reaching this conclusion, the ALJ only partially credited Plaintiff's complaints, but discredited them to the extent that they were inconsistent with the RFC.

The ALJ found that Plaintiff was not capable of performing her past relevant work.  However, the ALJ concluded that there were jobs in the national economy that Plaintiff could perform, such as marker, order caller, and assembler.  Accordingly, the ALJ determined that Plaintiff was not under a disability through the date of the decision. (R. 20-30.)

## IV.  DISCUSSION

Plaintiff raises one issue on appeal. Plaintiff argues that the ALJ erred at step three of the sequential evaluation by not finding that she met the requirements of Listing 12.05B for mental retardation.

To meet a Listing, a claimant must meet all of the specified medical criteria, and an impairment that fails to do so does not qualify no matter how severely it meets some of the criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The claimant bears the burden of demonstrating that she meets a Listing. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

The listing for mental retardation in Listing 12.05 requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[21]  The diagnostic description states that an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."[22]  Subaverage general intellectual functioning refers to an

---

[21]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[22]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

IQ of about 70 or below on various standardized intelligence tests.[23]  Listing 12.05B requires that the claimant have a "valid verbal, performance, or full scale IQ of 59 or less."

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listing.  The ALJ is not required to explicitly discuss each Listing where he applies the appropriate sequential analysis and his conclusions are supported by substantial evidence — *see, e.g., Battle v. Astrue,* 243 Fed. Appx. 514, 519-21 (11th Cir. 2007) (unpublished)[24] (rejecting claimant's argument that ALJ is legally required to explicitly evaluate the IQ score and 12.05 Listing).

Plaintiff asserts that her verbal IQ score of 51 and full scale IQ of 53 from 1978 on the Wechsler Intelligence Scale brings her within listing 12.05B.  The Social Security regulations provide that "in cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these [three] in conjunction with 12.05." 20 C.F.R., Pt. 404, Subpt. P, App. 1 at § 12.00 (C)(6)(c).

There are several problems with Plaintiff's argument. First, while the lowest IQ score is below 59, the IQ test was administered more than 30 years ago when Plaintiff was twelve years old, and as such under the regulations is not considered valid.

---

[23] DSM-IV at 42.

[24] Although unpublished opinions are not binding on this Court, they are persuasive authority.  11th Cir. R. 36-2.

Second, Plaintiff never argued at the hearing that she suffered from intellectual

disability and thus there was no reason for the ALJ to expressly address listing 12.05B.

And lastly, even if the thirty year old IQ scores were valid substantial evidence does not

show that Plaintiff had the requisite deficits in adaptive functioning.

Turning first to the out-dated IQ scores from 1978 they are not valid under the

regulations. The regulations provide:

> IQ test results must also be sufficiently current for accurate assessment
> under 12.05.  Generally, the results of IQ tests tend to stabilize by the age
> of 16.  Therefore, IQ test results obtained at age 16 or older should be
> viewed as a valid indication of the child's current status, provided they are
> compatible with the child's current behavior.  IQ test results obtained
> between ages 7 and 16 should be considered current for 4 years when
> the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.
> IQ test results obtained before age 7 are current for 2 years if the tested
> IQ is less than 40 and 1 year if at 40 or above

20 C.F.R. part 404., subpart P, app. 1, § 112.00D10.

The scores which Plaintiff contends bring her within listing 12.05B are not

sufficiently current, as they are from 1978 when Plaintiff was only twelve years old. And

notably, the tests were conducted more than thirty years before the ALJ rendered the

decision in this case. Thus, because IQ scores do not stabilize until an individual

reaches age 16, even assuming the scores stay valid over a period of time, Plaintiff's

scores were not conducted in a time frame where they could be considered stabilized.

Plaintiff argues that *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir. 2001) creates

a presumption that her IQ was stable throughout her life.  Close inspection of *Hodges*

dose not support Plaintiff's reading. *Hodges* had nothing to do with whether thirty year

old IQ scores, conducted before the claimant even reaches 16, are valid under the

regulations.  In *Hodges*, the plaintiff presented a current qualifying IQ score from a test administered during the period the claimant was applying for disability. In contrast, in this case, the IQ tests were conducted more than thirty years ago. The issue in *Hodges* was not the date of the IQ scores but whether the evidence of deficits in adaptive functioning was sufficient even though there was no evidence that those deficits manifested before age twenty-two.  The ALJ, there, found that the claimant failed to prove she met listing 12.05 because she did not present evidence of deficits in adaptive functioning that manifested before 22.  The Eleventh Circuit held that a "claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she presented evidence of low IQ test results after the age of twenty-two," reasoning that IQ scores generally remain constant throughout life.  Thus, *Hodges* did not discuss or even mention whether, as here, an IQ score obtained before the age of 16 is presumptively valid 30 years later. Importantly, *Hodges* never considered or mentioned  20 C.F.R. part 404., subpart P, app. 1, § 112.00D10, which explicitly states that IQ scores do not stabilize until 16.  The instant case, therefore, is controlled by the regulation, 20 C.F.R. part 404., subpart P, app. 1, § 112.00D10, and not by *Hodges*, a case that never addressed the issue of whether a thirty year old IQ score administered when the claimant was 12 years old can be considered when determining whether a claimant meets listing 12.05.

The second problem is that neither Plaintiff nor her representative ever mentioned or argued at the hearing to the ALJ that the Plaintiff had an intellectual disability. This certainly explains why the ALJ did not expressly address listing 12.05B.

Plaintiff does not argue that the ALJ erred by failing to address listing 12.05B specifically but rather faults the ALJ for not finding that she met the listing even though this deficiency was never mentioned.  The Commissioner's regulations do not require the ALJ to discuss all listings that could be applicable. *Tuberville v Astrue,* 316 F. App'x. 891, 893 (11th Cir. 2009)(*per curium*)("[t]hough the ALJ did not explicitly discuss why [claimant did not meet the Listing] substantial record evidence supports [that claimant did not meet the Listing]"). Indeed, where a claimant fails to raise a mental health issue as a basis for disability "an administrative law judge is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Street v Barnhart,* 133 F. App'x. 621, 627 (11th Cir. 2005).  Thus, the ALJ cannot be faulted for failing to address an issue that was never raised.

Notwithstanding Plaintiff's failure to advance this issue at the hearing, Plaintiff's argument that Plaintiff meets Listing 12.05B still fails even assuming *arguendo* that Plaintiff's IQ test from 1978 was sufficient to satisfy the requirement of the Listing. Plaintiff still fails to meet the Listing because IQ alone is not enough to determine mental retardation in that "[i]mpairments in adaptive functioning, rather than low IQ, are usually the presenting symptoms in individuals with Mental Retardation."[25]  While IQ often remains stable, adaptive functioning can improve with training,[26] and therefore a

---

[25] DSM-IV at 42.

[26] Id.

valid IQ score is not enough to determine if someone is mentally retarded.[27]

In the instant case, Plaintiff has not met the requirements of Listing 12.05B because the evidence does not show the required deficits in adaptive functioning. "Adaptive functioning" refers to an individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of the same age. *See,* Program Operations Manual System (POMS), DI24515.056.D.2.  Substantial evidence from Plaintiff's work history, activities of daily living and medical records demonstrate that Plaintiff did not have the requisite deficits in adaptive functioning sufficient to satisfy the Listing.

The most compelling substantial evidence of record showing that Plaintiff did not have deficits in adaptive functioning is Plaintiff's work history.  Plaintiff's work history evidences that she successfully performed semi-skilled work for a number of years while she supposedly had these low IQ scores. This fact standing alone is directly at odds with Plaintiff's claim that she is mentally retarded and reveals that— at least while working—she possessed adaptive functioning at or above borderline IQ levels.

In addition to the fact that she worked at semi-skilled jobs for a number of years, many of Plaintiff's activities of daily living are inconsistent with an individual who has deficits in adaptive functioning. For example, Plaintiff testified that she could take care of her personal needs, wash dishes, clean, prepare light meals and could do laundry.

---

[27] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

Moreover, Plaintiff had a driver's license and testified that she could drive short distances (R. 44, 45), an activity inconsistent with an individual who has deficits in adaptive functioning.

And lastly, the medical evidence of record evidences normal findings concerning Plaintiff's mental and intellectual ability. For example, Plaintiff's treating sources noted that Plaintiff did not have any abnormalities with communication, (R. 26, 175, 188, 306, 309, 312, 318, 372) and that Plaintiff had no memory limitations. (R. 23, 376, 383, 387, 399, 406). Notably, Plaintiff's medical records do not reflect that she was listed as "borderline intellectual ability" but rather only as below average, (R. 469), which is inconsistent with an individual who has deficits in adaptive functioning.

In sum, Plaintiff's sole argument that Plaintiff met Listing 12.05B is based upon a thirty year old IQ test administered when Plaintiff was twelve years old. Alternatively, even if the Court ignored the fact that the regulations provide that the test should not be considered, Plaintiff has failed to point to substantial evidence that she had the required deficits in adaptive functioning to meet Listing 12.05B.

Accordingly, for these reasons, the Court concludes that substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal a listed impairment.

## V. RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

      **IN CHAMBERS** at Gainesville, Florida this 15th day of June, 2015.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

      **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.